## The Sunbury and Erie Railroad Company *v.* Cooper.

The Supreme Court has no original jurisdiction in equity of a bill for specific performance.

An equity suit instituted at Philadelphia, must pass through the Court of Nisi Prius, before it can properly come before the court in *banc*.

A bill in equity will not be sustained to enforce the specific performance of a contract for the purchase of the bonds of a corporation.

But if the court in which the suit is brought have jurisdiction of the cause of action, both at law and equity, it may proceed to give relief, unless the bill be demurred to, on the ground that the proper remedy is at law.

The judiciary have no authority to enforce a pledge, by the legislature, of the public faith, and of the public works and their income, to secure the payment of money borrowed to construct the works.

No court has authority to set aside a public law, on the ground that it was passed by the legislature in fraud of the rights of the people.

The Act 21st April 1858, authorizing the sale of the state canals, is constitutional; and the judiciary have no power to declare the sale void for inadequacy of price, or for any undue favour to local interests supposed to have influenced it.

IN EQUITY.* This was a bill in equity by the Sunbury and Erie Railroad Company against Lewis Cooper, for the specific performance of a contract for the purchase of $100,000 of the bonds of the Delaware Division Canal Company.

The bill set forth that under the Act of the 21st April 1858, the complainants purchased from the Commonwealth of Pennsylvania, the Delaware Division of the Pennsylvania Canal, and all the other canals and property mentioned and described in the said act, and thereby authorized to be sold, for the sum of $3,500,000, on the terms and conditions therein expressed. That the governor, on the 19th May 1858, conveyed the same to them in fee simple, and delivered to them possession thereof; and thereupon gave notice of the said sale and delivery, by proclamation.

That on the 10th July 1858, the complainants, by virtue of the authority given by the said act, and with the written consent and approval of the governor, in consideration of $1,775,000, sold, conveyed, and delivered the Delaware division of the said canals, to The Delaware Division Canal Company of Pennsylvania, who entered into possession of the came.

That The Delaware Division Canal Company paid to the complainants on account of the purchase-money of said canal $75,000

* This case was argued before the court in banc and remitted to the Court of Nisi Prius, to be there decided. A decree was made at Nisi Prius, from which no appeal was taken; and the opinion delivered by the Chief Justice, having been concurred in by Justices STRONG, THOMPSON, and PORTER, the reporter deemed it of sufficient importance to be here inserted. WOODWARD, J., did not hear the argument, being a stockholder in the company.

[The Sunbury and Erie Railroad Company v. Cooper.]

in cash, and gave them negotiable promissory notes of responsible and solvent individuals, for the further sum of $400,000, with security for the payment of the same; and also transferred to them $100,000 in the stock of the said company, with a guarantee that the same should pay perpetually a dividend of eight per cent. That they also executed to the complainants their bonds for $1,200,000 bearing interest at the rate of six per cent., and a mortgage on the canal to secure the payment of the same.

That the complainants sold the other divisions of the said canals to other companies; and thus became the owners of a large amount of valuable and negotiable securities, the proceeds of said sales; and were thus placed in the possession of means to obtain money as it might be required, for the vigorous prosecution of the work of constructing their railroad to the harbor of Erie.

That on the 20th September 1858, a contract was made with Lewis Cooper, the defendant, whereby he agreed to and did purchase from the complainants, one hundred of the said bonds of The Delaware Division Canal Company, for $1000 each, for the price or sum of $85,000, on condition that the said bonds were valid, and secured by a lawful mortgage, the first existing lien on the said Delaware division of the canals; ten of which bonds the defendant agreed to receive on the 25th September 1858, and to pay to the complainants for the same, on delivery, the sum of $8500.

That the complainants, on the 25th September 1858, tendered to the defendant the said ten bonds, and demanded of him the sum of $8500; but the defendant refused to accept the same, and alleged that the said bonds were not valid, and were not secured by a lawful mortgage on the said canals, because neither the complainants nor The Delaware Division Canal Company ever had a valid title to the said canal; and that the said Act of 21st April 1858 was unconstitutional, and The Delaware Division Canal Company was not a lawfully constituted company; whereas the complainants expressly charged the contrary thereof.

They, therefore, prayed the court to decree and declare the said Act of 21st April 1858, to be a valid and constitutional law of this Commonwealth; and that the said bonds of The Delaware Division Canal Company of Pennsylvania were valid bonds, secured by a lawful mortgage of the said Delaware division of the canals, the first existing lien thereon; and that the defendant might be decreed specifically to perform his contract for the purchase thereof; and for further relief, &c.

The defendant by his answer admitted the contract set forth in the complainants' bill, and averred his readiness to fulfil the same, if the said bonds were valid, and secured by a lawful mortgage, the first lien on the Delaware Division Canal. But that doubts had arisen as to the validity of the Act 21st April 1858; and as

[The Sunbury and Erie Railroad Company *v.* Cooper.]

to how far the same was constitutional and valid; and by reason thereof the said bonds could not be sold in the market. That he was advised that the said bonds were not valid bonds, secured by a lawful mortgage, the first existing lien on the said canal; that the said Act of 21st April 1858 was unconstitutional and void; that neither the complainants nor the Delaware Division Canal Company had any title to the said canal; and that the said act was repugnant to the provisions of the Constitution of Pennsylvania, and the amendments thereto, adopted in 1857, and to the provision of the Constitution of the United States, forbidding any state legislature to enact a law impairing the obligation of contracts.

The cause came on for hearing on bill and answer.

*Knox*, Attorney-General, and *Gibbons*, for the complainants.

*Black*, Attorney-General of the United States, and *Hirst*, for the respondent.

The opinion of the court was delivered by

LOWRIE, C. J.—The plaintiff is possessed of a large amount of bonds issued by the Delaware Division Canal Company, and has contracted to sell $100,000 of them to the defendant; but he refuses to perform his contract, and the plaintiff has brought this bill in equity to compel him to perform it.

We know of no law giving the Supreme Court in banc original jurisdiction over such a cause of action as this, and we must not assume it. This is not a proper case for this equitable form of remedy, for we can see no reason why the damages that are recoverable in the common law form are not an adequate redress for the breach of contract. And if it were otherwise, this cause, being instituted at Philadelphia, is required by law to pass through the Nisi Prius, before it can properly come up in banc.

Though we do not regard the case as a proper one for the application of this equitable form of remedy, yet the Nisi Prius has jurisdiction of the *cause of action*, and it may give redress in the equity form, if the defendant does not demur to the form, even though the common law form is the more appropriate one: *Brightly's Equity*, § 24. The court in banc has original jurisdiction of some classes of cases, if brought in the equity form, and not, if brought in the common law form, and there the form is an essential element of the jurisdiction; but it is not so in the inferior courts, which have original jurisdiction of the cause of action irrespective of the form.

We are therefore of opinion, that this cause may be tried and decided at Nisi Prius; and as we heard it fully argued in banc before adverting to the foregoing considerations, and as it is a

[The Sunbury and Erie Railroad Company *v.* Cooper.]

case of great and pressing importance, it will be decided there by the judge of this court who shall next hold that one, on this opinion drawn up with the concurrence of the three judges who heard the argument, and will be subject to appeal to a full bench. If the parties desire to be heard again, the case may be argued on appeal, with more direct reference to the views now to be expressed, and with the aid of the experience derived from the argument already had.

The case comes up on bill and answer, and therefore there is no dispute about the evidence.

The plaintiff became the purchaser under the Act of 21st April 1858, of certain canals belonging to the state, and sold a part of them to the Delaware Division Canal Company, and in consideration thereof received the bonds which it afterwards contracted to sell to the defendant, and which he refuses to take and pay for. Has he a sufficient excuse for this refusal ?

The defendant founds his refusal on the allegation that the plaintiff had no valid title to the canal sold to the Delaware Division Canal Company, and that, therefore, the bonds in question, given by them on their purchase, are liable to a defence for failure of consideration: and this allegation is attempted to be sustained by various arguments which we now proceed to consider.

1. It is urged, that when the state was contracting her public debt in constructing her canals, she pledged their income for the payment of the principal and interest thereof, and that she cannot, in good faith to her creditors, part with that income for any other purpose.

This objection assumes that this sale is an improper one, and is really a diversion of the pledge ; and we may, for the present, allow it the advantage of this assumption. It assumes, moreover, that this court has some sort of authority, directly or indirectly, to enforce the pledge ; and this we are not prepared to admit.

How the objection might be answered as a question of morals, we are not to discuss; for we can exercise no authority on that ground in this case. If this court has no legal or constitutional authority to enforce the pledge, we have none to declare that it has been violated. And most certainly no such authority has been proved to us, and we know of none. The state also pledged its *faith and credit* for the same purpose ; and it would not be pretended that we have authority to enjoin the legislature to respect this part of the pledge by providing adequate taxation. For such a pledge, as well as for the one insisted on, the remedy is a moral one, to be enforced by means of the moral sense of the community operating upon the legislature, and by means of the moral sense of the civilized world operating upon both the people and the legislature ; an influence and responsibility to which all states are subject.

2. It is objected, that the Act of the 21st April 1858 is a palpable fraud upon the people of the state, and that, therefore, this sale, made under it and depending upon it, is voidable.

In support of this objection, the following facts are relied on:

That works, producing a net revenue which represents a principal of over nine millions of dollars, are sold for three and a half millions.

That they are sold to a railroad corporation that has proved itself totally unable, for want of capital, to build even the half of its own road.

That, though part of the consideration is, for a while, to be secured on the works sold, yet, in the end, this security is to be withdrawn and a mortgage of seven millions, on a still unfinished railroad, is to be substituted, one half of which is for the security of the state and the other half for the security of persons from whom the company may hereafter borrow money at any rate of discount to complete their road; and thus, even the consideration-money is risked upon the chances of a finished and successful road, and by sharing with subsequent creditors the benefit of the mortgage security, when it might have been abundantly and very naturally secured by a mortgage on the works sold.

That the canals are sold to the plaintiff not to be retained and managed, but to be resold at advanced prices to the profit of the plaintiff, and in such a form as to allow the plaintiff to have the ability to pledge them as security for money to be borrowed.

That these, and other facts, show that the Act of Assembly, instead of being what it professes to be—a simple sale of the public works—is fraudulently intended as an act in aid of the Sunbury and Erie Railroad Company.

That its passage was secured by improper influences brought to bear on the members of the legislature—the interests of the state having been sacrificed to local interests on the line of the road; to the interests of Philadelphia, which is a large stockholder; to the interests along the line of the Allegheny Valley Railroad, which is to be aided by a subscription of half a million of dollars; and to interests along the North Branch, by reason of a preference that is given to the inhabitants there in the resale of the North Branch Division.

Certainly, these facts present a case that justifies an argument in support of the proposition, that the Act of Assembly was not passed for the mere purpose of selling the public works, but mainly in aid of the Sunbury and Erie Railroad Company; that its passage was secured by the influence of private, or at least local interest, to the prejudice of the interests of the state; and they furnish elements for the argument that it is a fraud upon the people.

But is this the proper tribunal to try such a question? May

[The Sunbury and Erie Railroad Company *v.* Cooper.]

the judiciary sit in judgment upon a charge that the legislature have been faithless to their oaths, to the constitution, and to the public interests, by passing a law that is a fraud upon the state? This question was not discussed; and yet, unless it can receive an affirmative answer, all the argument on this branch of the subject must be regarded as out of place.

We cannot hesitate a moment on this question. We have no such authority, and ought not to have. However far the legislature may depart from the right line of constitutional morality, we have no authority to supervise and correct their acts on the mere ground of fraudulent or dishonest motives. We know of no such check upon legislation, and would not desire to see such a one instituted. The remedy for such an evil is in the hands of the people alone, to be worked out by an increased care to elect representatives that are honest and capable. If the judiciary have such authority, then every justice of the peace is competent to sit in judgment upon every act of legislation which disorderly moralists or knavish or ignorant anarchists may choose to charge as fraudulent. Nay more, if the question may be raised in a judicial proceeding, the judges and justices of the peace will be *bound* to investigate and decide it; and the principal judicial business might then become that of testing, not cases by the standard of the law, but the standard itself by the infinitely various and uncertain judicial notions of morality.

And notice, the principal element of fraud charged here is, that members gave undue prominence to local interests; that is, that they regarded too much the wishes and interests of their constituents. In order to condemn this, there must be some rule of law declaring that undue devotion to the interests of constituents is a fraud upon the state; and there must, besides, be judges possessed of supreme indifference to such interests, and capable of precisely defining what, for each case, is undue devotion. It is very easy to see that a power, having such control over legislative motives, would be destructive of all free legislation and seriously obstructive of social development.

We do not say, that a party who has obtained the passage of a private Act of Assembly by bribery, imposition, or other fraudulent means, can claim any benefit from it if the fraud be shown; perhaps this would be treated in the same manner as a judgment in court, or a title from the land office, obtained by fraud. But here is no pretence of fraudulent practices by the purchaser of the canals. The legislature, on its own motion, and for its own reasons, tendered the bargain on certain terms, and those terms were accepted. The motives of the legislature in so doing cannot be inquired into by the courts.

3. It is further objected, that the Act of Assembly is unconsti-

[The Sunbury and Erie Railroad Company *v.* Cooper.]

tutional, and therefore no valid title to the canals can be made under it.

The argument in support of this objection is founded on the same facts that were insisted on, as evidence of *fraud*, in support of the objection which we have just considered.

*Now* it is urged, that these facts prove that the Act of Assembly is not in truth for the sale of the canals, but in aid of the Sunbury and Erie Railroad Company, by means that are forbidden by the constitution :—that a sale of the canals at less than half their value, to a railroad company without means, and with a road projected which it cannot possibly finish without aid ;—a sale made with the expressed intention that the canals shall be resold at a profit to the railroad company, and under an arrangement by which the price is to be secured on the railroad alone, and by which the prospective debts of the company are to be of equal *lien* with the price to be paid to the state ;—a. sale effected, not by public biddings where competition is invited, but by an Act of Assembly fixing all the terms, and carried by the influence of local interests, some of which are illegitimately and unnaturally brought into connection with the scheme of the act ;—it is insisted that this is no sale at all, but a gift, or mainly a gift of the canals to the railroad company, and is forbidden by the constitutional amendments of 1857, which dedicate the income or proceeds of the sale of the public works to the sinking fund for the payment of the public debt.

Here again, and under another aspect, the sincerity and honesty of the legislature, in the performance of their duties, is attempted to be made a question of judicial cognisance; and again we say, that we have no jurisdiction of such a question, and can have no right to express any official opinion in relation to it. Official morality in us requires that we shall not assume authority to judge of the official morality of the legislature. For the faithfulness and honesty of their public acts, we repeat, they are responsible to the public alone, and not by means of a trial before the courts.

We must interpret their acts as they intend them to be interpreted. They declare this to be a sale, and we are not to attribute to the legislature improper motives in order to construe it a gift. It is a sale in a very ordinary form, by means of a proposal made and accepted. This might be a better means of sale than it would be to put the canals up at auction to the highest bidder; for such large sales require large combinations of capital, and these combinations might easily be formed so as to exclude competition. The legislature alone has authority to select the form of the sale ; and, if it chooses the form of proposal and acceptance of terms, it alone can make the proposal.

The amendments to the constitution dedicate the proceeds of

[The Sunbury and Erie Railroad Company *v.* Cooper.]

the sale to the sinking fund; but they, in no particular, limit the legislative authority to sell. In this matter, it is the supreme authority in the state; its act is the act of the state by its legitimate organ; in that act, it had a discretion to exercise which the courts cannot, without usurpation, review or criticise.

Every owner of property may sell it at as low a price as he pleases; may favour whom he pleases in the bargain; may regard other than mere financial interests; and the people may do the same with their property; and the legislature, acting for them, are the judges of what the people themselves would do. The courts cannot investigate the justice of their judgment.

This may be a sale for a very inadequate price and on very inadequate security, but certainly it is a sale and not a gift. It may have been induced by motives that sacrifice the public interests of the people to mere local ones; but these motives cannot, in their nature, be subjects of judicial cognisance.

It does not legally vitiate a contract, that there are other motives for it in the minds of the parties, besides the consideration named in it. Almost all contracts have such motives. A man may sell his house or his horse because he does not wish to keep it, or does it under some moral or financial necessity of parting with it, or thinks that it will better suit another to use it or take care of it, as well as because he is getting a price for it in money or other valuable things. It is still a sale, notwithstanding these private motives, and though the price may be a low one.

And a state, as well as an individual, may have motives for a sale independent of price; and it is the legislature that is to ascertain and act upon these motives. This is a part of their duty in every act of legislation. They must express and act upon the motives of the people in every exercise of their legitimate authority. Whether they do it well and faithfully or not, the people must judge; for they have instituted no authority to do it for them.

Such an authority is in fact impracticable. In the very nature of humanity, people *must* trust very largely to the good faith and discretion of their public agents, if they would have a government that is worth anything. They cannot have an efficient government, if they do not allow it a large freedom in its movements. And they cannot have honest and honourable men in office, if they are to be always suspected by the people because of their office. And if the people choose dishonest men for public positions, no amount of suspicion and no system of checks will be adequate to save them from the evils and cost of a dishonest government.

Legislative motives may be immoral and faithless; but *acts* alone can be unconstitutional. Motives belong to our interior morality, and are not naturally subject to legal regulation; and so far as the

[The Sunbury and Erie Railroad Company *v.* Cooper.]

state attempts it, all liberty of conscience is endangered. Morality regards action and its motives, while law regards the action alone. Law does not sanction or *allow* improper motives, but it is incompetent to read them; they belong to the forum of conscience. Law has no condemnation for acts that are not unlawful, while morality takes higher ground and condemns conduct if its *motives* be bad.

Acts that are not forbidden by the constitution, in form or substance, cannot be constitutionally condemned because of the motives that induce them. No human conduct could stand such a test, and no human skill could be trusted to apply it. If we should attempt it here, it might well be asked—"Who art thou that judgest another man's servant? to his own master he standeth or falleth."

Laws and constitutions are designed as means of social order and harmony; but they would be the very reverse of this, if no act could be justified under them, until its *motives* should be ascertained and approved. Law, the more it undertakes to treat conduct by motives, the more it is apt to be disorderly and tyrannical. It does, sometimes, pass judgment upon malicious and fraudulent motives, when it finds external acts clearly indicating them, and in such cases especially it is often cruelly oppressive in its conclusions. We cannot thus try legislative acts. To judge of their validity by motives would be impossible, for the prevailing motive in the mind of every member might be different.

It was attempted, on the argument, to test the validity of the Act of Assembly by applying to it the somewhat analogous private relation of principal and agent, but the test is inappropriate. A private agent to sell simply acts out the motives, known or unknown, of his principal; whereas a legislator has generally to seek, in his own experience and observation, for the motives which ought to justify his acts and to be satisfactory to the public. Moreover, the judicial authority of the state is instituted to judge of the fulfilment of the duties of private relations, and not to decide whether legislators have faithfully fulfilled theirs; though, as judicial authority, it may protect private rights even against legislative acts, if they are forbidden by the constitution.

In view of what we have now said, it seems to us, that the remaining points of the case may be briefly disposed of.

We do not perceive that, by the sale under this Act of Assembly, the state assumes the debt of any corporation, or lends her credit to any, or becomes a stockholder in or joint owner with any. The sole foundation of the arguments to establish these points is, that the price and the security are inadequate. But on this subject we are not authorized to supervise or review the discretion and judgment of the legislature. If we could supervise it, we could direct and control it, and we have not this much authority

over the political discretion even of municipal corporations. If the price and security had been adequate, in the judgment of the objectors, they could have found no footing for the argument which they have made. They have not attempted to prove that this court has authority to decide this fundamental question.

The subscription that is required to the Allegheny Valley Railroad, and the preference given on a resale to the inhabitants along the North Branch, may have been motives inducing the act in whole or in part, but they are not part of the legal consideration of the sale. It may be, that some members may have thought that a connection of the Sunbury and Erie with the Allegheny Valley Road would be a valuable one, and would increase the security of the debt to the state; and that the North Branch Canal would be best managed for the public good, by being owned by the people of the neighbourhood. But we are not called upon to ascertain or account for legislative motives, for we could not sit in judgment upon them, even if we knew them. A law that the legislature may make we must obey, whatever may have been their motive, even though it be a very unwise one.

The provision, under which the company contracts to pay to the state three-fourths of the profits of a resale of the canals, does not make the state a joint owner, with the company, of the canals. She reserves no title in them in any sense that could have been meant by the constitution. It is a sale out and out, but with a contract to increase the price in a certain event. The company's share of the profits of resale may be unreasonable, but of this the legislature alone could judge in making its proposal of sale.

We are therefore of opinion, that no valid legal or constitutional objection has been suggested against the title granted under the Act of Assembly, and that none of those which have been made can be maintained, either by state creditors, or taxpayers, or the canal commissioners; and at the next Nisi Prius, we shall direct a decree in favour of the plaintiff, according to the prayer of the bill. We declare our opinion now in advance, in order that the parties may have the more time to consider the subject, preparatory to a reargument on appeal to the court in banc, if they shall think an appeal advisable.

And now, to wit, the 13th day of December 1858, this cause having been heard upon bill and answer, and the counsel of the parties having argued the same, and the same having been duly considered by the court, it is ordered, declared, and decreed that the Act of Assembly in the said bill mentioned, entitled "An Act for the sale of the State Canals," approved the 21st of April 1858, is a valid and constitutional law of the state of Pennsylvania; and that the Delaware Division Canal Company of Pennsylvania have

[The Sunbury and Erie Railroad Company *v.* Cooper.]

acquired a lawful title to the canal and property to them conveyed by the Sunbury and Erie Railroad Company; and that the bonds of the said The Delaware Division Canal Company in said bill mentioned, are valid, and are secured by a lawful mortgage of the said canal, and which mortgage is the first existing lien thereon.

And it is further declared and decreed, that the said Lewis Cooper, the defendant, do specifically perform the agreement entered into with the said complainant in the said bill mentioned, and do receive the said bonds, and do pay to the complainant therefor as thereby agreed, with interest from the time when the same ought to have been paid. And inasmuch as before the filing of the said bill ten of the said bonds therein mentioned had been by the complainant tendered to the defendant according to the terms of the said agreement, it is further decreed and declared that the said defendant, on the delivery of the said ten bonds to him, do pay to the complainant the sum of eight thousand five hundred dollars, with interest from the 25th September 1858, until such payment be made; and that the complainant have leave to apply, from time to time, for such other order and decree in respect to the residue of the said bonds as they may be advised.

And it is further ordered, that the said defendant pay the costs of this cause.